**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| REXJAE LYNSHON REED,<br><br>Plaintiff,<br><br>v.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>Defendant. | ) | CASE NO. 5:25-CV-02237-JDA<br><br>MAGISTRATE JUDGE JENNIFER DOWDELL ARMSTRONG<br><br>**MEMORANDUM OPINION AND ORDER** |

## I. INTRODUCTION

Plaintiff RexJae Lynshon Reed ("Ms. Reed") seeks judicial review of the final decision of the Commissioner of Social Security denying her applications for Social Security Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). This matter is before the Court pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). The parties have consented to my jurisdiction pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73. (ECF No. 4). For the reasons set forth below, the Court REVERSES the Commissioner's final decision and REMANDS this case to the Commissioner for further proceedings consistent with this opinion.

## II. PROCEDURAL HISTORY

On August 21, 2023 and September 14, 2023, Ms. Reed filed her applications for DIB and SSI respectively. (Tr. 226, 239). Ms. Reed's applications related to her bipolar disorder, anxiety disorder, attention deficit hyperactivity disorder (ADHD), and premenstrual dysphoric disorder. (Tr. 282).

The Social Security Administration ("SSA") denied Ms. Reed's applications initially and

upon reconsideration. (Tr. 120, 130, 131, 141). Ms. Reed requested a hearing before an administrative law judge ("ALJ"). (Tr. 175). The ALJ held a hearing on November 4, 2024, at which Ms. Reed was represented by counsel. (Tr. 35). Ms. Reed testified, as did her mother, Tinia Gillems, and an impartial vocational expert ("VE"). On November 19, 2024, the ALJ issued a written decision, finding that Ms. Reed was not disabled. (Tr. 15). The ALJ's decision became final on August 15, 2025, when the Appeals Council declined further review. (Tr. 1).

On October 20, 2025, Ms. Reed filed her complaint, challenging the Commissioner's final decision. (ECF No. 1). Ms. Reed asserts the following assignment of error:

(1) The administrative law judge's finding that plaintiff retained a residual functional capacity for a range of unskilled work is not supported by substantial evidence.

(ECF No. 8, PageID # 1424).

## III. BACKGROUND

### A. Personal, Educational, and Vocational Experience

Ms. Reed was born in 2000 and was 21 years old on the alleged onset date. (Tr. 226). She has a high school diploma. (Tr. 283). Ms. Reed is not married and has no children. (Tr. 226-27). Ms. Reed does not have any past relevant work. (Tr. 27).

### B. Relevant Hearing Testimony

#### *1. Ms. Reed's Testimony*

Ms. Reed testified that, at the time of the hearing, she took several medications, including Abilify, trazodone, Lybalvi, and birth control. (Tr. 43). Ms. Reed testified that she has been sleeping well and that she sleeps between 10 and 11 hours per night. (Tr. 44). However, she also testified that when she gets anxious, she cannot sleep. (Tr. 45). She testified that she has not had issues sleeping since she began taking trazodone. *Id*. Ms. Reed also testified that she works between four hours and one day per week at JC Penney cleaning the fitting rooms, and that she has worked there for the past three years. (Tr. 43).

### 2. *Tinia Gillems*

Tinia Gillems, Ms. Reed's mother, testified that she does not believe Ms. Reed could work full-time at JC Penney given her anxiety. (Tr. 52-53). She testified that, when Ms. Reed first started at JC Penney, she was trained on using the cash register, but became anxious and could not do it. (Tr. 53). Ms. Gillems also testified that she asked Ms. Reed's manager to give Ms. Reed a job that was not stressful, and they gave her work in the dressing room. (Tr. 54). Ms. Gillems testified that she was not sure why Ms. Reed could not work in the dressing room full-time. (Tr. 54-55).

Ms. Gillems testified that, when Ms. Reed has insomnia issues, she paces around her room and becomes manic after a day or two. (Tr. 55-56). Ms. Gillems testified that Ms. Reed has been to the hospital several times for insomnia and was hospitalized for almost a week on one occasion. (Tr. 55). Ms. Gillems also testified that Ms. Reed will sometimes become aggressive toward Ms. Gillems, and that Ms. Reed will also become aggressive toward hospital workers if Ms. Gillems waits several days before taking Ms. Reed to the hospital. (Tr. 56). Ms. Gillems further testified that Ms. Reed cannot perform her job at JC Penney when she is having a manic episode. (Tr. 57). Ms. Gillems also testified that Ms. Reed's medications help control her bipolar disorder and help her sleep, and that she takes Ativan as well when she has trouble sleeping. (Tr. 58).

### 3. *Vocational Expert's Testimony*

The ALJ asked the VE to consider a hypothetical individual with Ms. Reed's age, education, and lack of prior work experience who had no exertional limitations and could follow simple instructions that involved no more than simple, work-related decision making; was limited to occasional interaction with others without arbitration, negotiation, or confrontation; could not direct the work of others, be responsible for the safety or welfare of others, or work at a production rate pace; and would be limited to occasional workplace changes in a routine work setting. (Tr. 63-64). The VE testified that the hypothetical individual could perform jobs existing in the national

economy, including work as a cleaner, kitchen helper, or laundry worker. (Tr. 64-65). However, the VE testified that no jobs would exist if the individual would be off-task 33 percent of the day or absent from work one day per week. (Tr. 65).

## C. <u>Relevant Opinion Evidence</u>

### *1.* ***State Agency Psychologists***

On March 4, 2024, Ann Lovko, Ph.D., a state agency psychologist, opined that Ms. Reed had a mild limitation in her ability to understand, remember, or apply information and moderate limitations in her ability to interact with others; concentrate, persist, or maintain pace; and adapt or manage herself. (Tr. 115). Dr. Lovko further opined that Ms. Reed had moderate limitations in her ability to maintain attention and concentration for extended periods; work in coordination with or proximity to others; make simple work-related decisions; complete a normal workday and workweek; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers and peers; and respond appropriately to changes in the work setting. (Tr. 117). On May 21, 2024, Joelle J. Larsen, Ph.D. concurred with Dr. Lovko's findings upon reconsideration. (Tr. 139).

The ALJ found that the opinions of the state agency psychologists were persuasive but rephrased some of the language in their opinions in more vocationally relevant terms. (Tr. 26-27).

### *2.* ***Bryan Krabbe, Psy.D.***

On October 19, 2022, Dr. Krabbe conducted an evaluation of Ms. Reed in connection with her disability claim. (Tr. 459). Dr. Krabbe opined that Ms. Reed's attention and concentration skills were below average and that her intellectual functioning appeared to fall below normal limits. (Tr. 463). Dr. Krabbe also opined that Ms. Reed performed below average on brief abstract reasoning and short-term memory activities and had difficulty completing serial sevens and serial threes. (Tr. 464). Dr. Krabbe further opined that Ms. Reed may have difficulties acquiring new

information in work settings, maintaining attention and concentration, and responding to work pressures. (Tr. 464-65).

The ALJ found that Dr. Krabbe's opinion had limited persuasive effect. (Tr. 26). The ALJ found that Dr. Krabbe's opinion was generally persuasive with respect to the presence of severe mental impairments but was of little persuasiveness regarding Ms. Reed's residual functional capacity because Dr. Krabbe did not opine about specific, function-by-function limitations. *Id*.

*3. **Patricia Millsaps-Linger, Ph.D.***

On February 10, 2023, Dr. Millsaps-Linger, Ms. Reed's psychologist, wrote a letter in connection with Ms. Reed's disability claim. (Tr. 670). Dr. Millsaps-Linger opined that Ms. Reed has periods of stability mixed with periods of instability and that she has ongoing challenges with maintaining a sleep routine, resulting in multiple days each month where she is unable to sleep. *Id*. Dr. Millsaps-Linger also opined that Ms. Reed struggled in setting realistic goals and recognizing her cognitive and emotional limitations. *Id*. Dr. Millsaps-Linger further opined that it was unlikely that Ms. Reed would successfully maintain full-time employment. *Id*.

The ALJ found that Dr. Millsaps-Linger's opinion had little persuasive effect because the question of whether Ms. Reed could work was reserved to the Commissioner and because Dr. Millsaps-Linger was not qualified to opine on vocational considerations. (Tr. 26). The ALJ also noted that Dr. Millsaps-Linger did not provide any opinions regarding Ms. Reed's maximal functioning. *Id*.

**D. Relevant Medical Evidence**

On June 23, 2021, Ms. Reed presented to the emergency room with her mother and grandfather, complaining of manic symptoms, including insomnia, rambling, preoccupying thoughts, anxiety, pacing, and increased emotionality. (Tr. 387, 410). They reported that she had just returned from a seven-day vacation in Las Vegas, and that she slept approximately 10 hours

total during that time. (Tr. 410). Her mother reported that Ms. Reed slept approximately eight hours the night before, but woke with anxiety. *Id*. Her mother also reported that Ms. Reed received a Kenalog shot on April 27, 2021, and that her mood had been up and down since the shot. *Id*. On examination, Ms. Reed was cooperative and anxious, with normal speech, affect, and thought process, fair insight, fair judgment, and intact memory. (Tr. 411). She was discharged on the same day with a one-time dose of trazodone and a prescription for Zyprexa, and her mother was given information for an intensive outpatient program or partial hospitalization program. (Tr. 387, 411, 417).

During the relevant period, Ms. Reed received counseling from Dr. Millsaps-Linger. On April 5, 2022, Ms. Reed informed Dr. Millsaps-Linger that she had obtained a job at JC Penney. (Tr. 692). On April 21, 2022, Ms. Reed told Dr. Millsaps-Linger that she liked her new job. (Tr. 691). Dr. Millsaps-Linger also noted that Ms. Reed's medications had been adjusted. *Id*.

On April 22, 2022, Ms. Reed presented to the emergency room, complaining that she had not slept in three days. (Tr. 364). Her family reported that she had slept a total of eight or nine hours the entire week. *Id*. Ms. Reed also reported that she had previously experienced insomnia as a result of her bipolar disorder. *Id*. She said that she went to a different emergency department the previous day and was prescribed trazodone and another medication, and that her Zyprexa was also increased. *Id*. On examination, Ms. Reed was positive for sleep disturbance, but the examination was otherwise normal. *Id*. Ms. Reed and her family became agitated due to the length of the wait and exited the emergency department before she could be seen by a psychiatrist. (Tr. 369).

At a May 5, 2022 appointment with Dr. Millsaps-Linger, Ms. Reed was anxious, fatigued, and reported trouble sleeping. (Tr. 689). On May 25, 2022, Ms. Reed reported that she was not having trouble sleeping but that she was struggling at work and in general. (Tr. 688). On June 9, 2022, Ms. Reed was again anxious and reported trouble sleeping. (Tr. 687). She told Dr. Millsaps-

Linger that she was applying for disability due to ongoing difficulties working. *Id*. Ms. Reed said, "it's not fair that I'm this way. I didn't ask to be here or be like this." *Id*.

Ms. Reed had another appointment with Dr. Millsaps-Linger on June 23, 2022. (Tr. 686). She said that she walked out of a Father's Day church service, vomited in her mouth, and had to run to the bathroom to keep it together. *Id*. She reported that she was still working four to eight hours on the weekends and was doing better. *Id*.

On July 7, 2022, Dr. Millsaps-Linger noted that Ms. Reed had a disjointed presentation. (Tr. 685). Ms. Reed said that she was so tired that she could not remember anything. *Id*. She also said that she had gotten into an argument with her mother because she could not sleep. *Id*. Ms. Reed further reported that she was continuing to work a few hours per week, but that she could not work the cash register because it was too stressful. *Id*. It was noted that her medications had been adjusted again. *Id*.

On July 26, 2022, Dr. Millsaps-Linger noted that Ms. Reed had low energy and difficulty paying attention, forcing Dr. Millsaps-Linger to repeat herself. (Tr. 684). Ms. Reed reported that she was sleeping okay and that she had enjoyed a recent trip. *Id*. Ms. Reed also said that she was bored, and she and Dr. Millsaps-Linger brainstormed ways for Ms. Reed to spend her time. *Id*. Ms. Reed said that she was working 12 hours per week. *Id*.

At an August 25, 2022 session with Dr. Millsaps-Linger, Ms. Reed was "all smiles" and presented with accelerated speech. (Tr. 682). She reported that she had not been sleeping and that her mind had been racing. *Id*. Ms. Reed said that she was taking over a dance team and was thrilled to have something to do. *Id*. She also said she wanted more hours at work. *Id*.

On September 22, 2022, Ms. Reed told Dr. Millsaps-Linger that she had been having trouble sleeping since September 11, 2022, and that she went to the emergency room on the

weekend of September 14th. (Tr. 680).[1] Ms. Reed also reported that she was back on track now. *Id*. She said that she was back on Zyprexa and that she had obtained more hours at work. *Id*.

Ms. Reed saw Dr. Millsaps-Linger again on October 20, 2022. (Tr. 678). Dr. Millsaps-Linger noted that Ms. Reed presented with low energy and limited self-awareness. *Id*. Ms. Reed reported another episode of insomnia and said that she had spent five days at her grandparents because she did not want to be alone. *Id*. She also reported that she had been sleeping without difficulty since then. *Id*. Dr. Millsaps-Linger noted that Ms. Reed's medications had been increased. *Id*.

On November 16, 2022, Ms. Reed had an appointment with Elizabeth Mason, M.D. for her premenstrual dysphoric disorder. (Tr. 469). Ms. Reed reported that she had been experiencing increasing episodes of mania over the course of the year. *Id*. Dr. Mason stated that it was unlikely Ms. Reed's oral contraceptives were exacerbating her manic episodes and counseled against making changes to her oral contraceptives. *Id*. Dr. Mason discussed obtaining a second opinion from psychiatry because it sounded like Ms. Reed's bipolar disorder was better controlled on different medications in the past. *Id*. Ms. Reed's mother requested information on guardianship. *Id*.

Ms. Reed had a counseling session with Dr. Millsaps-Linger the next day. (Tr. 676). She reported that her sleep was off again, but was unable to share any specific details. *Id*. She also reported that she worked 12 hours the previous weekend. *Id*. On January 5, 2023, Ms. Reed fell asleep at her counseling session. (Tr. 673). She reported that she had not been sleeping for more than four hours since December 23rd. *Id*. Dr. Millsaps-Linger noted that Ms. Reed's mother was applying for guardianship. *Id*.

On January 9, 2023, Ms. Reed had an appointment with Nurse Practitioner Melissa

[1] It does not appear that documentation of this emergency room visit is in the record.

Gelsomino. (Tr. 476). Ms. Reed reported experiencing manic episodes every month since April 2022. (Tr. 476). She also said that it was her first time having an episode in four years. *Id.* On examination, Ms. Reed was cooperative, friendly, engaged, and calm, with a congruent affect, appropriate speech, thought content, and thought processes, intact memory and judgment, and fair insight. (Tr. 481-82). Nurse Gelsomino stated that Ms. Reed's bipolar disorder was significantly impacting her ability to work and her family life. (Tr. 483). Nurse Gelsomino also stated that Ms. Reed would benefit from medication management and counseling. *Id.* Nurse Gelsomino added Lybalvi to Ms. Reed's prescriptions. (Tr. 476).

On February 13, 2023, Ms. Reed had a follow-up appointment with Nurse Gelsomino. (Tr. 486). Ms. Reed said that she had not experienced any manic episodes since her last appointment but that she felt tired on Lybalvi. *Id.* A mental status examination was normal. (Tr. 487). At another follow-up visit on March 13, 2023, Ms. Reed reported that she was doing well and had not experienced any further episodes. (Tr. 492). On March 9, 2023, Ms. Reed likewise told Dr. Millsaps-Linger that she was sleeping well and had not had any episodes in approximately two months. (Tr. 668).

Ms. Reed had another session with Dr. Millsaps-Linger on April 20, 2023. (Tr. 665). Dr. Millsaps-Linger noted that Ms. Reed was doing worse than usual and was hard to follow when responding to questions. *Id.* Dr. Millsaps-Linger also stated that Ms. Reed did not seem to push through challenges. *Id.*

At a June 5, 2023 follow-up visit with Nurse Gelsomino, Ms. Reed's mother reported that Ms. Reed was "really really good" and "doing so good." (Tr. 499). On June 12, 2023, however, Nurse Gelsomino prescribed trazodone for sleep and increased Ms. Reed's Lybalvi dosage for possible mania after Ms. Reed reported that she had not slept in three days. (Tr. 502-03). On June 14, 2023, Nurse Gelsomino adjusted Ms. Reed's medication again, noting that she was suffering

a manic episode. (Tr. 504-05). Nurse Gelsomino also recommended that Ms. Reed seek inpatient treatment for stabilization if she did not get any relief. (Tr. 505).

On June 16, 2023, Ms. Reed went to the emergency room, complaining of insomnia. (Tr. 611). It was noted that Ms. Reed did not have pressured speech and did not seem manic at that time. (Tr. 618). She was admitted for evaluation. *Id*. After a psychiatric evaluation, she was discharged the same day and instructed to take an increased dosage of Zyprexa in accordance with her prescription. (Tr. 624).

On June 22, 2023, Ms. Reed told Dr. Millsaps-Linger that she had experienced a two-week episode of not sleeping and feeling overwhelmed. (Tr. 661). Ms. Reed also reported that she had finally slept the night before. *Id*.

On June 29, 2023, Ms. Reed's mother called Nurse Gelsomino's office to inform them that Ms. Reed had gone to the emergency room and that she was sleeping after her medication had been adjusted. (Tr. 506). She also reported that Ms. Reed was very tired and was sleeping a lot. *Id*. Nurse Gelsomino's office informed her that it was normal for a patient to experience lethargy after an intense manic episode. *Id*. On July 6, 2023, Ms. Reed told Dr. Millsaps-Linger that she was feeling much better, sleeping well, working on weekends, and volunteering at church. (Tr. 660).

On July 10, 2023, Ms. Reed's mother texted Dr. Millsaps-Linger to inform her that Ms. Reed was having difficulty sleeping and was reactive, impulsive, and crying, though she calmed down after taking Ativan. (Tr. 659). Ms. Reed's mother also informed Nurse Gelsomino's office that Ms. Reed was having another manic episode. (Tr. 508). Her medication was adjusted. *Id*.

On July 13, 2023, Ms. Reed's mother canceled Ms. Reed's appointment with Opportunities for Ohioans with Disabilities, saying that Ms. Reed had not slept for the past six days and was having bipolar issues. (Tr. 701). Her job search was put on hold. *Id*. On the same day, Nurse

Gelsomino noted that Ms. Reed had experienced multiple manic episodes over the previous one-to-two months with frequent medication changes. (Tr. 511). On telephonic examination, Ms. Reed displayed a manic mood. *Id*. Ms. Reed's medications were adjusted again, and Nurse Gelsomino wrote a note excusing Ms. Reed from two days of work. (Tr. 513-14).

Ms. Reed visited the emergency room again on July 15, 2023, complaining of insomnia for the past week. (Tr. 546). She reported feeling anxious and unwell. *Id*. On examination, she was aware, alert, oriented, pleasant, cooperative, and displayed a flat affect. *Id*. Her mother reported that she was sometimes saying things that were not rational and did not make sense. *Id*. Ms. Reed was diagnosed with a manic episode and admitted for inpatient psychiatric evaluation. (Tr. 553). The next day, Ms. Reed reported that she had slept "a little" since receiving Zyprexa. (Tr. 558). She was disorganized and tangential on examination and required redirection to discuss her symptoms. *Id*. She became tearful when told she would not be discharged that day. *Id*. The treating resident physician noted that Ms. Reed appeared to exhibit bona fide psychomotor agitation and that she appeared to be in a mixed mood episode. (Tr. 557). She also stated that Ms. Reed was not safe for discharge until her symptoms at least partially resolved. *Id*. Ms. Reed was discharged on July 20, 2023, after four nights of improved, sustained sleep. (Tr. 565). During her stay, she demonstrated an improved ability to control her mood and emotions. *Id*.

At a July 26, 2023 psychiatric visit, Ms. Reed reported that she was sleeping and feeling better. (Tr. 799-800). At a counseling session the next day, Dr. Millsaps-Linger found Ms. Reed slumped over in the lobby and noted that she seemed to be sedated. (Tr. 656). Ms. Reed was rambling and had random thoughts. *Id*. On August 9, 2026, Ms. Reed was alert and engaged and reported feeling more stable. (Tr. 655). On August 21, 2023, Ms. Reed's mother reported that Ms. Reed was having a difficult sleeping again and wondered if she was becoming manic. (Tr. 847). Her medications were increased. (Tr. 849).

At a September 7, 2023 session with Dr. Millsaps-Linger, Ms. Reed was very tired because she had been up since 3:00 a.m. (Tr. 839). She also reported having a meltdown that morning. *Id.* On September 21, 2023, Ms. Reed reported that she was sleeping better since her medications were adjusted. (Tr. 900).

At an October 1, 2023 psychiatry visit, Ms. Reed reported that she had enjoyed her recent cruise and that she wished she were still in the Cayman Islands. (Tr. 1188-89). She did not have any complaints. *Id*. On examination, Ms. Reed was cooperative and friendly, anxious, and alert, with intact judgment and insight, normal thought content, and fair insight. *Id*. Her medication was adjusted. (Tr. 1189). On December 6, 2023, Ms. Reed was stable on her medication regimen. (Tr. 955-56).

Ms. Reed presented to her primary care physician, Dr. Ahmad Kharis Ibrahim, M.D., on December 12, 2023. (Tr. 911). She reported that she was working at JC Penney without issues and that she had recently gone on a cruise. *Id*. An examination was normal. (Tr. 912-13). On January 4, 2024, Ms. Reed reported to Dr. Millsaps-Linger that she was sleeping well.(Tr. 975). Ms. Reed was again doing well at a January 26, 2024 psychiatry appointment. (Tr. 959-60).

On March 14, 2024, Dr. Millsaps-Linger noted that Ms. Reed was naïve and in her own world. (Tr. 1081). She also noted that Ms. Reed had limited awareness of the real world and zero problem solving skills. *Id*. At that time, Ms. Reed was sleeping well and had an increased appetite. *Id*. On April 11, 2024, Dr. Millsaps-Linger noted that Ms. Reed's mother had helped her apply for a job. (Tr. 1079).

On April 15, 2024, Ms. Reed went to the emergency room again after not sleeping for two days. (Tr. 1364). It was noted that Ms. Reed was unable to answer questions. *Id*. On examination, Ms. Reed was oriented but disorganized. (Tr. 1364). She was advised to take Risperidone twice per day as prescribed, rather than once per day. (Tr. 1371). She was monitored for five hours before

being discharged. *Id*.

Ms. Reed had another psychiatry appointment on April 17, 2024. (Tr. 1217). A mental status exam was largely normal, and she reported that she was functioning at work. *Id*. However, Ms. Reed and her mother called twice the next day to report that she had not slept. (Tr. 1221-22). Her medications were adjusted. (Tr. 1222).

Ms. Reed went to the emergency room again on April 19, 2024. (Tr. 1339). Her mother reported that, other than insomnia, Ms. Reed was not displaying any symptoms of mania. *Id*. On examination, Ms. Reed had a normal mood but a mildly flat affect. (Tr. 1342-43). It was noted that she was not acutely psychotic and was not manic. (Tr. 1343).

On May 9, 2024, Dr. Millsaps-Linger stated that Ms. Reed had low energy, racing thoughts, and could not recall the details of the past few weeks. (Tr. 1288). Ms. Reed was working one day per week, but had missed work because of her symptoms. *Id*. On May 22, 2024, Ms. Reed's mother reported that they were unable to lower the dosages of Ms. Reed's medications because she could not sleep. (Tr. 1230). Ms. Reed's mother also reported Ms. Reed's sleeping difficulties on May 28, 2024 and June 3, 2024. (Tr. 1233-34).

On June 6, 2024, Dr. Millsaps-Linger noted that Ms. Reed had low energy, trouble focusing, and difficulty responding to questions. (Tr. 1290). Ms. Reed was anxious on June 13, 2024 and said that she could not relax. (Tr. 1291).

Ms. Reed had a follow-up visit with Dr. Ibrahim on June 12, 2024. (Tr. 1264). She reported that her mental health was okay. *Id*. She was having trouble sleeping, but her insomnia had improved. *Id*. She also said that she was volunteering at church. *Id*. On July 17, 2024, Ms. Reed's mother reported that Ms. Reed was back to her normal self. (Tr. 1315). Ms. Reed also reported that she was working. *Id*. On August 8, 2024, Ms. Reed told Dr. Millsaps-Linger that she was sleeping well. (Tr. 1299). On September 25, 2024, Ms. Reed reported that she was working on the

weekend. (Tr. 1319). Her prescription for Risperidone was discontinued. *Id*.

## IV. THE ALJ'S DECISION

The ALJ first determined that Ms. Reed met the insured status requirements of the Social Security Act through March 31, 2024. (Tr. 21). The ALJ further determined that Ms. Reed had not been engaged in substantial gainful activity since January 1, 2022, the alleged onset date. *Id*.

The ALJ next determined that Ms. Reed had the following severe impairments: major depressive disorder, bipolar disorder, anxiety disorder, learning disorder, and ADHD. *Id*. The ALJ found, however, that none of Ms. Reed's severe impairments, whether considered singly or in combination, met or medically equaled the severity of any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 22).

The ALJ next determined that Ms. Reed had the residual functional capacity ("RFC") to:

> perform a full range of work at all exertional levels but with the following nonexertional limitations: The claimant can follow simple instructions that involve no more than simple work-related decision making. The claimant can tolerate occasional interaction with others that does not involve arbitration, negotiation or confrontation. The claimant cannot direct the work of others or be responsible for the safety or welfare of others. The claimant cannot perform work requiring a specific production rate such as assembly line work or work that requires hourly quotas. The claimant is limited to handling occasional workplace changes in a routine work setting.

(Tr. 24).

The ALJ next found that Ms. Reed had no past relevant work. (Tr. 27). However, the ALJ also determined that Ms. Reed could perform jobs that existed in significant numbers in the national economy, including work as a cleaner, kitchen helper, or laundry worker. (Tr. 27-28). Accordingly, the ALJ determined that Ms. Reed was not disabled. (Tr. 28).

## V. LAW & ANALYSIS

### A. Standard of Review

"After the Appeals Council reviews the ALJ's decision, the determination of the council

becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at*2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 Fed. Appx. 315, 320 (6th Cir. 2015) (quoting *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)); *see also* 42 U.S.C. § 405(g).

"Under the substantial evidence standard, a court looks to an existing administrative record and asks whether it contains sufficien[t] evidence to support the agency's factual determinations." *Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019) (quotation omitted). The standard for "substantial evidence" is "not high." *Id.* While it requires "more than a mere scintilla," "[i]t means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quotation omitted).

In addition to considering whether substantial evidence supports the Commissioner's decision, the Court must determine whether the Commissioner applied proper legal standards. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.*, *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp.

2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)) (alteration in original).

**B. Standard for Disability**

To establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315, 404.1505(a). A disabled claimant may also be entitled to receive SSI benefits. 20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981). To receive SSI benefits, a claimant must meet certain income and resource limitations. 20 C.F.R. §§ 416.1100 and 416.1201.[2]

Consideration of disability claims follows a five-step review process. 20 C.F.R. §404.1520. First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. §§ 404.1520(b) and 416.920(b). Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c) and 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education, or work

[2] The DIB and SSI regulations cited herein are generally identical. Accordingly, for convenience, in some instances, citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 *et seq.* The analogous SSI regulations are found at 20 C.F.R. § 416.901 *et seq.*, corresponding to the last two digits of the DIB cite (*e.g.*, 20 C.F.R. § 404.1520 corresponds with 20 C.F.R. § 416.920).

experience. *See* 20 C.F.R. §§ 404.1520(d) and 416.920(d).

Before considering Step Four, the ALJ must determine the claimant's residual functional capacity, *i.e.*, the claimant's ability to do physical and mental work activities on a sustained basis despite limitations from her impairments. 20 C.F.R. § 404.1520(e) and 416.930(e). At the fourth step, if the claimant's impairment or combination of impairments does not prevent her from doing her past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) and 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, the claimant is not disabled if other work exists in the national economy that the claimant can perform. 20 C.F.R. §§ 404.1520(g), 404.1560(c), and 416.920(g). *See Abbott*, 905 F.2d at 923.

**C. Analysis**

In her sole assignment of error, Ms. Reed argues that the ALJ erred in formulating her RFC. Ms. Reed's argument has two components. First, she argues that the ALJ misconstrued the record when describing her history of treatment for bipolar disorder and related insomnia. Second, she argues that the ALJ failed to apply proper legal standards when evaluating the opinion of Dr. Millsaps-Linger. Ms. Reed's first argument is well-taken, while her second is not.

*1. **The ALJ's Factual Misstatements and Omissions***

Ms. Reed first argues that substantial evidence does not support the ALJ's RFC determination because the ALJ failed to discuss evidence regarding her history of treatment for bipolar disorder and because the ALJ mischaracterized some of the evidence that the ALJ did discuss. In particular, Ms. Reed argues that the ALJ understated the frequency with which she went to the emergency room for insomnia and other symptoms of bipolar disorder, and that the ALJ mistakenly found that she was consistently discharged from the hospital within 24 hours.

In his decision, the ALJ noted that Ms. Reed went to the emergency room on multiple

occasions for manic spells, often characterized by poor sleep. (Tr. 22). The ALJ also found at Step Three that "[d]uring such periods, the claimant's ability to consistently interact in a socially appropriate fashion would likely show some significant impairment" and a "significant decrease in ability to focus on tasks." (Tr. 22-23). In formulating Ms. Reed's RFC, the ALJ likewise found that episodes of hospitalization were "indicative of significant problems with manic spells, causing insomnia" and that "[d]uring such spells, it is probable that [Ms. Reed's] ability to tolerate stress, stay focused, and deal with all ranges of social interaction is impaired." (Tr. 25).

The ALJ also found, however, that Ms. Reed's hospitalizations did not warrant a more restrictive RFC because "the record shows roughly one emergency room presentation per year since 2021, only," and that those episodes "are not reflective of [Ms. Reed's] daily average functioning." *Id*. In reaching that conclusion, the ALJ cited to emergency room visits that Ms. Reed made on June 23, 2021, April 22, 2022, July 15, 2023, and April 19, 2024. (Tr. 25). The ALJ further found that, in each instance, Ms. Reed was discharged in stable condition within 24 hours. *Id*.

As Ms. Reed correctly notes, the ALJ's statement that she only presented to the emergency room roughly once per year was not accurate. In addition to the four instances that the ALJ cited, records also indicate that Ms. Reed went to the emergency room on April 21, 2022, September 11, 2022, June 16, 2023, and April 15, 2024. (Tr. 364, 680, 611, 1364). Ms. Reed thus went to the emergency room approximately twice as often during the relevant period as the ALJ suggested.

Ms. Reed is also correct that the ALJ misstated the extent of her treatment during one of the emergency room visits that the ALJ did discuss. The ALJ found that, when Ms. Reed presented to the emergency room on July 15, 2023, "a workup examination showed no signs of acute concerns, and [she] was once again discharged within twenty four hours in stable condition." (Tr. 25). In fact, Ms. Reed was diagnosed with a manic episode and admitted for inpatient psychiatric

evaluation. (Tr. 553). The next day, one of the doctors treating her noted that she was experiencing bona fide psychomotor agitation and was likely in a mixed mood episode. (Tr. 557). The doctor concluded that Ms. Reed was not safe for discharge until her symptoms at least partially resolved. *Id*. Ms. Reed was not discharged until July 20, 2023. (Tr. 565).

The ALJ thus mischaracterized the record in two respects, undercounting the frequency with which Ms. Reed went to the hospital and understating the severity of one of those visits. "An ALJ's reliance on a mischaracterization of fact may . . . deprive his findings of the support of substantial evidence." *White v. Comm'r of Soc. Sec.*, No. 5:23-CV-01826, 2025 WL 418268, at *19 (N.D. Ohio Feb. 6, 2025). Indeed, "[w]hen an ALJ's reasoning is 'based in part on an inaccurate description of evidence,' courts have 'repeatedly . . . held that the ALJ failed to build an accurate and logical bridge between the evidence and the result." *Buchanan v. O'Malley*, No. 5:24-cv-00009, 2025 WL 1009095, at *3 (N.D. Ohio Apr. 4, 2025) (quoting *Figueroa ex rel. E.A.R.F. v. Comm'r of Soc. Sec. Admin*., No. 1:20cv1765, 2021 WL 6280389, at *14 (N.D. Ohio Dec. 13, 2021)).

Given the ALJ's acknowledgement that Ms. Reed's functioning was impaired during periods of hospitalization, and the ALJ's explicit statement that Ms. Reed only went to the hospital roughly once per year, it appears that the ALJ may have ignored evidence of other hospitalizations. At a minimum, nothing in the decision permits the Court to determine whether the ALJ properly considered this evidence. Nor is there any indication that the ALJ considered evidence that Ms. Reed's July 2023 hospital visit resulted in her being admitted for five days. Remand is therefore required so that the ALJ can consider Ms. Reed's full history of treatment for bipolar disorder and related insomnia. *See Higginbotham v. Comm'r of Soc. Sec.*, No. 1:23-CV-1526, 2024 WL 2000570, at *9 (N.D. Ohio Apr. 16, 2024), *report and recommendation adopted*, 2024 WL 1996425 (N.D. Ohio May 6, 2024) ("In addition to the misstatements in her opinion, the ALJ's

failure to address portions of the record that challenged her findings . . . also warrants reversal.") (citing *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 723-24 (6th Cir. 2014); *Minor v. Comm'r of Soc. Sec.*, 513 F. App'x 417, 435 (6th Cir. 2013)); *French v. Comm'r of Soc. Sec. Admin.*, No. 5:25-CV-00285-AMK, 2026 WL 709735, at *9 (N.D. Ohio Mar. 13, 2026) ("Because it is not clear whether or how the ALJ factored the mischaracterized and/or omitted evidence into his Step Four findings, the Court finds the ALJ inadequately articulated his RFC analysis, failed to support that analysis with substantial evidence, and ultimately failed to build an accurate and logical bridge between the evidence and the result.") (quotations omitted).

The Commissioner makes several arguments in response, none of which are persuasive. The Commissioner first argues that an ALJ is not required to discuss all of the evidence in the record. That is true. *Simons v. Barnhart*, 114 F. App'x 727, 733 (6th Cir. 2004); *Boseley v. Comm'r of Soc. Sec. Admin.*, 397 F. App'x 195, 199 (6th Cir. 2010). However, while an ALJ need not discuss all the evidence, the ALJ also may not overlook or ignore contrary evidence. *See Gentry*, 741 F.3d at 724; *Minor*, 513 F. App'x at 435 (holding that an ALJ must conduct "a proper analysis of the medical evidence under agency regulations and controlling case law," and may not "cherry-pick[] select portions of the medical record"). The ALJ's affirmative statement that Ms. Reed only went to the hospital roughly once per year, combined with the ALJ's misstatements and omissions, make it impossible for the Court to determine whether the ALJ properly considered all the relevant evidence or whether the ALJ instead ignored evidence that ran contrary to his conclusions.

The Commissioner's also argues that the ALJ's factual errors were harmless. "[A] factual mistake may be considered harmless—and thus not a basis for reversal—where the ALJ's assessments and decision as a whole are supported by substantial evidence." *Butcher v. Comm'r of Soc. Sec.*, No. 5:23-CV-2451, 2025 WL 20756, at *4 (N.D. Ohio Jan. 3, 2025) (citing *Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 712-13 (6th Cir. 2012)). Here, however, substantial evidence

does not support the ALJ's assessments or his decision as a whole. To the contrary, the ALJ's misreading of the record regarding Ms. Reed's hospitalizations appears to have been crucial to his conclusion that Ms. Reed was not disabled. The ALJ expressly found that, during periods where Ms. Reed's insomnia was severe enough to require hospitalization, "it is probable that [her] ability to tolerate stress, stay focused, and deal with all ranges of social interaction is impaired." (Tr. 25). But the ALJ also concluded those periods were not indicative of her overall functioning, as Ms. Reed only went to the hospital roughly once per year and was consistently discharged within 24 hours. Because the ALJ's reasoning was based on inaccurate factual premises, substantial evidence does not support the ALJ's assessment or his decision as a whole.

Finally, the Commissioner argues that substantial evidence supports the ALJ's RFC determination because the ALJ found the opinions of the state agency psychologists persuasive and because the state agency psychologists considered records regarding Ms. Reed's emergency room visits. However, "[i]t is well established that is the responsibility of the ALJ . . . to evaluate all relevant medical evidence of record and determine a claimant's RFC." *Chilgren v. Saul*, No. 5:19cv26, 2020 WL 994656, at *5 (N.D. Ohio Mar. 2, 2020). The fact that the state agency psychologists may have considered Ms. Reed's emergency room records "does not absolve the ALJ of his independent responsibility to evaluate this evidence and adequately consider it in assessing [Ms. Reed's] RFC." *Id*.

This is not to say that Ms. Reed is necessarily disabled. However, reviewing the decision as a whole, the Court concludes that the ALJ's decision is not supported by substantial evidence because the decision is premised, at least in part, on factual misstatements, and because it is not clear that the ALJ properly considered all the relevant evidence. Remand is therefore required.

### 2. *The ALJ's Evaluation of Dr. Millsaps-Linger's Opinion*

Ms. Reed also argues that the ALJ erred in evaluating the opinion of Dr. Millsaps-Linger

because the ALJ did not adequately address the supportability and consistency of that opinion. The Court disagrees.

Under 20 C.F.R. § 404.1520c, the SSA considers opinions from medical sources under five factors: (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) other factors, such as familiarity with other evidence in the claim or with the disability program's policies and evidentiary requirements. 20 C.F.R. § 404.1520c(c). Section 404.1520c(b)(1) specifically provides that "it is not administratively feasible for [the ALJ] to articulate in each determination or decision how [the ALJ] considered all of the factors for all of the medical opinions and prior administrative medical findings in your case record." 20 C.F.R. § 404.1520c(b)(1). Of the five factors, supportability and consistency are the most important, and an ALJ must explain how her considered them. 20 C.F.R. § 404.1520c(b)(2). The ALJ "may" but "is not required to" explain how the ALJ considered the remaining factors. *Id*.

Dr. Millsaps-Linger opined that Ms. Reed struggled in setting realistic goals and recognizing her cognitive and emotional limitations and that it was unlikely that Ms. Reed would successfully maintain full-time employment. *Id*. Ms. Reed is correct that the ALJ did not discuss the supportability or consistency of Dr. Millsaps-Linger's opinion, and instead found only that the opinion was not persuasive because the question of whether Ms. Reed could work is reserved to the Commissioner. (Tr. 26). But the ALJ was entitled to discount the opinion on that basis. Indeed, 20 C.F.R. § 404.1520(b)(c) provides that certain evidence is "inherently neither valuable nor persuasive" and that the SSA will "not provide any analysis about how we considered such evidence . . . ." Evidence that is neither valuable nor persuasive includes "[s]tatements on issues reserved to the Commissioner," including "[s]tatements that you are or are not disabled, blind, able to work, or able to perform regular or continuing work." 20 C.F.R. § 404.1520(b)(c)(i).

Moreover, because Dr. Millsaps-Linger did not offer any opinions on Ms. Reed's

functional limitations outside of her statement that Ms. Reed could not work, the ALJ was not required to analyze the supportability or consistency of the opinion. *See Kubas v. Comm'r of Soc. Sec.*, No. 1:22-CV-00856-CEH, 2023 WL 4744279, at *6 (N.D. Ohio July 25, 2023) ("The ALJ did not use the supportability and consistency factors to evaluate Mr. Strnad's medical observations. However, this was unnecessary as Mr. Strnad stated that Claimant was unable to work, a disability determination reserved for the Commissioner."); *Spradlin v. Bisignano*, No. 1:25-cv-01612-PAG, 2026 WL 1223370, at *11 (N.D. Ohio May 5, 2026), *report and recommendation adopted*, 2026 WL 2055977 (N.D. Ohio July 16, 2026) (holding that ALJ was not required to analyze opinion where medical source opined that claimant was disabled); *Michelle V. v. Comm'r of Soc. Sec.*, No. 2:21-cv-5149, 2023 WL 2399448, at *3 (S.D. Ohio Mar. 8, 2023) ("The ALJ did not err by not conducting a supportability and consistency analysis, because it was reasonable to conclude that Mr. Switzer provided only one medical opinion about whether she could continue to work the same job—the analysis of which was reserved solely to the Commissioner."). Accordingly, Ms. Reed's argument that the ALJ erred by not addressing the supportability or consistency of Dr. Millsaps-Linger's opinion is without merit.

## VI. CONCLUSION

Based on the foregoing, the Court REVERSES the Commissioner's final decision denying Ms. Reed's applications for DIB and SSI and REMANDS this matter to the Commissioner for further proceedings consistent with this opinion.

Dated: August 25, 2026

<u>/s *Jennifer Dowdell Armstrong*</u>
Jennifer Dowdell Armstrong
U.S. Magistrate Judge